Welcome to the Fifth Circuit and our second day of arguments for this three-judge panel. Those of you who have been here before or know anything about the court will probably think this arrangement on the bench is quite unusual. I'm in the wrong place and Judge Jolly is in the wrong place. As a senior judge now, he doesn't get to preside even though he does tell the other two of us when we're doing wrong. So try to adjust as we have adjusted to that. One thing to mention is our lighting system. I think all of you who have been here before are certainly familiar with it. When you get to the end of your allotted time, the red light comes on, just finish your sentence and if we have more that we want to ask you, we will do that, but otherwise you are done. With that having been said, I will call the first case, United States v. Howard Halverson. Ms. Epps? You seem to be closer today. That's actually good. Maybe somebody will be able to hear me. You're coming through loud and clear. Please forgive my cough drop. I'm allergic to courtrooms, so if I don't keep one in my mouth, I will be coughing constantly. I would like to start out with the first proposition, the distribution enhancement, five-point distribution enhancement to the base offense level, unless the court would like me to start someplace else. You can start there. The government has conceded that the trial court applied the wrong standard. There was the amendment, Amendment 801, I believe it is, that had gone into effect shortly before Halverson was sentenced that changed the law in this circuit about when the enhancement should apply. The court felt like it was not required to follow the commentary for the new amendment, and so it applied the ruling in gross. As a result, Halverson was given that five-point enhancement. Now, the question becomes what relief is appropriate. The government says none. It argues two reasons for that. One, it says that the judge gave a variance, so the error was harmless. The problem with that argument is that this circuit has rejected the notion that an error in the application of guidelines is harmless. Even here, the judge has given a variance. Now— One of the problems with applying the case law you're talking about, it's not necessarily fatal to it, but his sentence that was given after the variance is still lower than the low end of the guideline after corrected by two years. At least when we're looking at harm, obviously one way to look at it is when the district judge starts with the guideline, no matter where he goes from there, that you have error. But the other side is with this sort of extraordinary variance and with the actual sentence being less than the corrected sentence, it's at least a different ballpark than we are usually in. Well, not according to some of the cases that I have cited. In the brief, there was one case where the court gave a 99-month downward variance, and the court held that it was nevertheless harmful because you have to start at the correct guideline in doing variance. And so that's why it was harmful. And here, the court specifically took into consideration the fact that Halverson had, under the enhancement, distributed the child pornography. So that was—the court very plainly said that that was one of the reasons for imposing the sentence that it did. And so what the case law says is that it is not harmless unless the government can show— let me see if I can get the exact quote here. It says the government has to point to evidence in the record that will convince the appellate court that the district court had a particular sentence in mind and would have imposed it notwithstanding the error. And the government, furthermore, must demonstrate the sentence was not influenced in any way by the erroneous guideline calculation. And here, where the court specifically said it was taking that into consideration and imposing the sentence, the government just simply cannot meet its burden on that. So I think that under the prevailing case law, the court would be required to reverse. Now the question—I think the next question would be, I don't think the evidence is sufficient to support the enhancement anyway. Under the new guideline, the government has to show that the defendant agreed to an exchange with another person under which the defendant knowingly distributed to that person for the specific purpose of obtaining something of valuable consideration from that other person. And the government has failed to do that. In fact, the proof shows that Halverson did not know that he was exchanging it with Agent Baker or any of the other agents who downloaded pornography using their law enforcement software. So there's no—the first thing that fails is that there's no agreement to exchange with another person. And you have to have an agreement in which the defendant knowingly distributed to that other person for the specific purpose of obtaining something of valuable consideration. Now the government argues that he gained priority downloads, but he got— but he didn't get it from sharing the child pornography. What he shared were innocuous files. So there's no moving up. What they did was—here's the problem with this case. This case is kind of unique because what Halverson had done—Halverson is a pretty savvy computer person. What he had done is he had altered his software program where it was not sharing from the usual sources. There are several places where files are shared in this particular software program, the Shariza program, the PTP program. The—there's the downloads folder. Now how files get in the download folder is somebody requests a file. Halverson would have requested a file. The file would have been downloaded in bits and pieces because that's the way this PTP software works. He would have downloaded it to a temporary directory where it had a hexadecimal file name rather than 14-year-old does obscene things, which would be the regular file name. It would be a little bit more graphic than that, but you get the idea. The bits and pieces go into a space that is created by the software. They fit in like a puzzle as they come in, and they go into that hexadecimal file name slot for the file. Now what they downloaded from him were files with hexadecimal names, so we know that those came from the temporary directory because once the file is completely downloaded into that temporary directory, the name changes—well, it gets virus checked, and it gets verified to make sure it is the file that was ordered. Then it's moved to the download folder where the name is changed to the regular name. So we know that the files did not come from the download folder because they didn't have the regular name. They had the hexadecimal name, plus Halverson had disabled sharing in the download directory. You just dipped below five minutes on your clock, and I wonder if you want to shift the gears. The restitution? Talk about restitution or the conditions of supervised release or anything else. Well, the restitution—I think what's difficult about the restitution is figuring out how to do restitution right. I think that the U.S. Supreme Court has made it very, very clear that restitution has to be tied to the loss that the defendant approximately caused to the victim. Now, it has given some suggestions about how to do that, and I think they're probably pretty good if they're followed. What happened here is the government relied on victims to provide information and did not require them to provide the information that the Supreme Court said you need. And they provided, for the most part, stale information, and so the poor trial judge was left there with no way to really determine what loss Halverson himself had caused as opposed to what the initial abuser had caused and other people who had downloaded files. So what the government did is it proposed this formula where it took the lowest amount requested by a victim, which in this case was— Just exactly say what is the error of the court in this respect. Well, it doesn't tie to the loss that Halverson caused the victim. It's arbitrary. It's just quite simply arbitrary. Well, there's certainly broad discretion, as you've already allowed. Sound judgment, use of discretion is what Caroline says. So there's a base number, and the one application of specific victim characteristics is how many images of that victim Halverson possessed. So the formula does at least take into account that if somebody had— Halverson had five photos of somebody compared to somebody else but there's only one, in the very rough way this has to be done, that the harm was worse to the one in which there were five photos rather than one. So it seems to me there's no good way to do this, and this is at least somewhat focused on specific— At least focused on victims. Well, it is focused on the victim, but what they did was they then took the number of images of the victim and multiplied that times the total number of images that he had, which has absolutely nothing to do with the loss caused to the victim. And there is a way to do it. It is not that— Assuming there is a way to do it, what is the difference in the amount of restitution if you do it your way as opposed to the way the district court did it? I think it's probably about $40,000 or so. So it's a total of $50,000. So you're saying that the defendant owes an aggregate amount of $10,000? Give or take. But what you can't do is you just can't make up a formula. And here's the way to do it, I think. Okay, you start out with the number of defendants who have been caught so far with the images. So you know how many you're dealing with. You find out—and the victims have this information. They know how many notices they have received from state and federal court of people who have been arrested with their images. They know how much money they have received. They know how many awards they have been given. And they know what their damages going forward are. And none of that was done. And you can—there are going to be some victims whose images were not on the Internet. And so there are not going to be a whole lot of future offenders. Have you noticed you have a red light? You have time for rebuttal. In the case of the court, Jason Corley of the United States, the affiliate in this case. I'd like to briefly address the five-level enhancement before moving on to restitution. As to the enhancement issue, Ms. Epps and the appellant have raised the argument that the defendant didn't distribute at all, and this was conceded by defense counsel at sentencing. And I quote from the record of appeal, the defense attorney at sentencing stated, quote, to the extent that the failure to—excuse me, that's a quote. As to distribution, we are not fighting that part. So the argument that he didn't distribute at all, that issue was conceded at sentencing by the defense attorney. The second part of their argument, besides the fact that they didn't distribute, is that they didn't distribute to an individual, and that individual didn't provide priority access to child pornography in some old-fashioned type of contract. And I would submit to this court that that's not what Amendment 801 is contemplating. Amendment 801 to the United States Sentencing Guidelines almost specifically focused on peer-to-peer networks, and I'm going to quote from the United States Sentencing Commission's policy statement of April 28, 2016, on page 10. Quote, the circuit conflicts involving these two enhancements, meaning the enhancements under 5G 2.2b3b, the circuit conflicts involving these two enhancements have arisen frequently, although not exclusively in cases involving the use of peer-to-peer file-sharing programs or networks. And that's, I believe, to be an important statement by the commission because the way Ms. Epps and Appellant are interpreting this amendment, it would never apply to any peer-to-peer case. If Appellant's interpretation is to be used and this court were to apply that, then it would never apply to any peer-to-peer case in the future, and that's clearly not what the commission contemplated. What happened in this case was that the defendant was distributing child pornography on a peer-to-peer network. He did so knowingly. As Ms. Epps said, he's a savvy and intelligent individual who knows what he's doing with computer technology. He distributed in exchange for priority access to more child pornography. The court considered that evidence. That evidence was testified to by the forensic expert, Agent Baker, at the district court level. The district court considered the defendant's arguments that Ms. Epps just put forward, and the district court found, although the district court did misspeak in filing United States v. Gross, the district court later found when announcing the sentence, and this is at page 556 of the Record of Appeal, the court found that the defendant distributed child pornography with the expectation he would in turn receive images and or videos of child pornography which were of value to him. That was a factual finding by the court, and the evidence supports that factual finding. It's the government's contention. There's no clear error in that factual finding, and the court should upheld that five-level enhancement. With the court's permission, I'd like to move on to the restitution issue. The restitution in these cases is hard, and I'm the trial attorney that handled this. It was my methodology that was put forward, and I would not submit to this court that the methodology that was used here should be used in every case. Let me ask you why it would make sense in this case to use that $1,409, whatever it is, amount. It correlates to a dollar per image. I just don't understand how that at all is consistent with Paroline. Your Honor, the application of the $1,409 may seem arbitrary, and I suppose to some extent that it is, but the holding in Paroline, at least the spirit of the holding, is, and this is on page 1729 of Paroline, that the approach articulated above, meaning the rough guideposts, involves discretion and estimation. And in that regard, Mr. Halverson had two hard drives that were never decrypted. We don't know the extent of his collection, but what we do know is that he had 1,409 unique images. And to the extent that estimation is a part of this calculation, assigning a dollar value to his behavior, the unique images that he had, I found to be no less arbitrary than simply assigning a round number of $1,000 or $2,000 to the amount that we were going to use. I hope that answers the Court's question. It tells me why you did it. It didn't, to me, explain why it's not arbitrary. Well, Your Honor, it may be arbitrary, but I would argue it's no less arbitrary than any other formula that would be used to assign a number. At some point, we've got to start making decisions where we're going to assign values to. And I think Paroline seems to insist on, though, is some rough effort to determine what degree did Halverson, or whoever the defendant is at the time, what portion of the overall harm to the victim is that person responsible for. This formula did not include any sort of effort to determine what other images were of this, of any particular victim had been downloaded by others. So you're looking at overall harm to victim number one relative to what Halverson did and all the others. Is that not more consistent with what the Supreme Court was insisting on, that you look at how many other defendants or how many other people had victimized this same person? Yes, Your Honor. So it's important to emphasize that the context of the formula that the government used was post a Paroline analysis by each victim. And I think that that context got lost somewhere in the briefings. So each of the six victims conducted their own Paroline analysis, and they submitted their restitution requests, so to speak, to the United States Probation Office and the United States Attorney's Office. And their Paroline analysis was asking for somewhere approximately of $86,000. I looked at that number and I said, okay, that's too high. So they've done their analysis. They've come to their general losses. Why did you say it was too high? I'm sorry? Why did you say it was too high? I mean that just looked too high. Based on the other cases that I've seen before district courts, experience told me it was too high, Your Honor. More or less here, more or less there? Correct. That's the only way you can— It's—and again, this goes back to rough estimation. I mean it's—my gut was that it was too high. Now if—that ties a little bit to some of the factors that Paroline considered, which is— He was not—I'm sorry. No, I'm just saying it seems like it's kind of a wasted effort to even try to figure the thing out. I'm sorry, Your Honor? Even—it's kind of a wasted effort to even try to figure the thing out. You just say read Paroline and do the best you can and let it go at that. Yes, Your Honor. If it's not totally unreasonable, just let it go. Well, thank you, Your Honor, and I think that that's essentially the government's contention here. In one simple sentence is the formula that was used was reasonable, and the numbers that we used were reasonable, and that's what Paroline contemplates. What about the $5,000 baseline amount to each victim? Can you describe just for me how that was causally linked to the defendant's participation? Yes, Your Honor. That was done to benefit Halverson. And I found that to be interesting that the defense and the appellant took such issue with it. The victims, as I said, were requesting $86,000. And when I sat down to try to reduce that number to come to—what is it that Paroline said? A number that's not trivial or not severe, so try to come to a reasonable number. I reduced all of the victims' requests to the victim asking for the least, and that was to benefit Halverson, not to arbitrarily choose any other number. I could have picked the high number, but I picked the low number in deference to the defendant and worked up from there based on the number of images he had of each victim. And it's also based on the idea that all of these victims are similarly situated. Yes, it's true that they have different general losses and their mental health status may be— What was the age of the victims generally, branching between what and what? Oh, it ranges quite a bit. Vicki's an older victim. I believe her images—and I'm going off of memory, Judge—but I believe her images are from the 90s, whereas Pia is a relatively young victim. I think her images are from this decade. So we're talking about images that have ranged over 20 years. Unfortunately, these collections, due to individuals like Halverson, they just continue to exist. The 1,409 images, going back to Judge Southwick's question, was tied to his collection. And again, the context of the government's methodology was to reduce the total amount of restitution to a reasonable amount, meaning not trivial or not severe. But I wanted to tie it to Halverson's conduct, and while this formula may not be applicable in every case, I think it's important to emphasize what it was that Halverson was doing. He was using digital shredders to shred the images. He was using encrypted hard drives. He was studying how to avoid law enforcement. He was studying programming languages. And he was using the victims' images to collect more images. This was a collection that he was building. And I want to distinguish that from some other cases that we see at the district court level, where individuals download child pornography, but then they delete it. And that's a totally different kind of investigation that we have, where somebody is downloading the images and then deleting them thereafter. This individual was collecting them like baseball cards, and he was using an encrypted hard drive to maintain that collection. And he was continuing the trade and sharing of these images. The Supreme Court acknowledged in Caroline that the general losses by the victim are the trade in their images, and that a distributor, particularly a distributor, was what the Supreme Court said, is a larger contributor to these general losses than an individual who is merely possessing them. Halverson is collecting, distributing, possessing. He says he's doing the full gamut. The only thing he didn't do was produce. And in that regard, his total collection is a causal, a relevant causal inquiry, which is number seven under the Caroline factors, because he was trading these images to build his collection. And that was the motivation for his harm to these victims. And as such, I believe it's a relevant causal inquiry into the restitution amount. The other issue. Let me ask you about restitution. What is our role as an appellate court? Restitution is mandatory. The Supreme Court has made it clear that district judges are supposed to be, and Congress too, I guess, are supposed to be considering the actual impact on the victims. Do we have any role independent of what the defendant is complaining about to make sure that restitution does fairly compensate under the rules that have been established to the victims? And if we decide that your formula was too generous to the defendant, do we have any role to play? I believe we do have a role to play, Your Honor. The difficulty of Caroline is that it involves, by the Supreme Court's own statement, rough guideposts. I guess what concerns me about what you did, the formula that you convinced the district judges to follow, is that you took the lowest amount any victim who is entitled to determine how many other people have already been identified who have had these, what sort of proportion of loss and damage to myself was caused by this particular person, and you erased all of that individual consideration that came from the victims and just took the lowest amount. I'm not saying it's reversible. It makes me wonder, in light of what is trying to be achieved, whether it's enough to say neither side is saying that's too low a number. Your Honor, in response to that, I think what I would say is as a practical matter, as a factual matter, I was in communication with the victims' attorneys throughout the process. Is there a network you go through? Is there a database somewhere with all these victims and photographs that are being able to be compared and identified all through just computer databases? Yes, Your Honor, it's a bit complicated, but it's a hassle, actually. The National Center for Missing and Exploited Children out of Washington maintains the database of known child pornography victims. The result of this is you do have contact with actual attorneys or representatives for each of the victims who has been identified. Yes, I communicated with each individual attorney that represented each victim requesting restitution. They gave me the approval of the method that I was going to use. They actually signed off, you said, on the formula. I'm sorry? They signed off on the formula. The victims did? They did. And, Judge, I'll say I'm not sure that that's in the record, but I will submit and represent to this court that I spoke with. Each representative told them how I was going to do this, and they said, Thank you. Do what you need to do. Okay. Move on. Yes, Your Honor. The Supreme Court is asking district courts and the government to consider seven factors, but really limitless factors based on number seven, being that the other facts relevant to the defendant's relative causal role, which can differ in each and every case, to reach a restitution number that is neither trivial nor severe and that involves discretion and estimation. I would submit to this court that that is precisely what the government and the court did in this case, an attempt to capture Mr. Halverson's behavior and his harm to the victims in a manner that did not result in a trivial restitution order, and I think that's what concerns me in some of the other cases that I've seen. For example, the United States versus Jimenez, which obviously the district court did no analysis whatsoever, and it concerns me when cases like that go back and the ultimate conclusion is a $100 award, a $200 award. The government submits that there needs to be some methodology used through Paraline that is actually going to provide the victims with the restitution they seek, and it needs to be tied to the defendant's behavior and his conduct, and I believe that we did that in this case. Let me ask you about the last issue on prohibiting any Internet-capable software. How is that consistent with recent case law and the importance of individuals having access to the Internet? Yes, Your Honor. The Packingham case, in our view, was addressing the situation where a felony offense is being levied against individuals for free association. It's really a different case here when we're talking about supervised release. We're talking about supervision by the court on an individual who has already been convicted of a felony, who's being supervised by the court, and who is not precluded from using the Internet. Mr. Halpas is not precluded from using the Internet when he gets out. He simply needs to go through the probation office and explain to them what it is that he's doing. That's quite different than Packingham. Packingham says it's a felony to get on Facebook, period, for anyone who's a sex offender, and that's for anybody who's not on supervised release, who's not on probation, whereas here what we're talking about is an individual who's still on supervised release, who's still being supervised by the court. And he would have the opportunity, if he didn't agree with the probation officer, to appeal to the district court. That's correct, Your Honor. That's correct. He's well-protected. Yes, if Halverson wants to use the Internet, that's correct, Judge Shelley, in our view, if Halverson wants to use the Internet in the future and probation isn't letting him and he thinks it's a legitimate use, he would certainly have the option to take that up at the district court, particularly if it was for work or for religious reasons or whatever it may be. What does this restriction mean that you shall not access any Internet service? Internet service? The court is asking about Internet service? You shall not subscribe to any online service, nor shall you access any Internet service. What does that second portion mean? Your Honor, I interpret that to mean an Internet service provider, such that what they're saying is without the probation officers, excuse me, without the probation officer's permission, the defendant is not to subscribe to an Internet service provider. He's not to have Internet in his home or connected to his home without first discussing that with probation and getting probation's approval. Obviously, it's different than not having Internet access. Anybody can go to a Starbucks and plug into the Wi-Fi. But the issue here is obviously that his history of sharing child pornography is such that without some supervision by the probation office, the court would not want him getting Internet access to his home. What is your interpretation of the sentence in Packingham? It doesn't seem to me the Supreme Court is very clear on what sentence he got, but it seems to me you're arguing he was free, Packingham, of all supervision at the time of the operation of this condition. Yes, Your Honor. My understanding of Packingham is that he was a convicted felon and a sex offender. But he was not actually on supervision at that point in time. And he was logging into Facebook, and his posts on Facebook were ultimately what led to felony charges for using social media as a sex offender. And that's distinguished from Mr. Halverson, obviously, who's on supervised release and is still being supervised by the court once he's released from prison. Well, Packingham did get probation, but apparently you believe he was no longer on probation at the time? That is my memory of the case, and I may be incorrect about that. But my memory is that he was no longer on probation at the time that he was charged with the new felony. All right. Anything else for us? Briefly, Your Honor, the government's position is that the five-level enhancement and the statement by the court is harmless error. The facts and the records support the five-level enhancement. And even if they don't, the court varied to such a degree that it moots the defendant's objection to it. The restitution is a reasonable amount. The Supreme Court has charged district courts and the government to come to a word that they're not trivial and not severe. And we did so in this case. The amount is reasonable for the victims, and the methodology employed was reasonable based on the defendant's conduct. Finally, on the two issues that I hardly addressed, we believe that the supervised release order in Packingham is reasonable. Thank you, Your Honor. Let me just say a quick word about that computer restriction. Down here it says you may not possess Internet-capable software, which would mean you couldn't possess Windows operating system or the Mac operating system. The end of that says unless specifically approved in advance by probation. It seems to me the setup here is whatever you're going to have in your home or elsewhere, pre-clear it with us. I don't read this, though you can tell me if you read it otherwise. It's not a day-by-day checking with probation. It's if you want to have Windows, as I assume you would, or you want to have any other service, you've got to notify before it becomes operative on your computer, but then you're free to use it. Havilson is free to use it. Well, that would be up to the probation officer. Once approved. And I think that it's a little bit overbroad in that respect. You may not possess Internet-capable software unless approved in advance in writing. So once he possesses it after being approved in writing, he possesses it legally. Well, that's your phone, your computer, everything now is your microwave, it's your car, it's your Alexa, it's your doorknob, it's everything in your life now has potential to be Internet. The answer is don't download these kinds of pictures onto your computer and you won't be subject to this sort of preclearance. Well, this is true. Havilson earned this particular restriction. Whether it's valid or not is what we're reviewing. But the guideline that applies to occupational restrictions, which this would fall under because he needs it to work, says that the judge has to make fact findings to justify and he has to use the least restrictive means. Now, there's some case law out of this circuit that talks about being able to use monitoring systems, which would monitor and would not require him to get written permission every time he wants to access the Internet. Now, I want to clarify something here. I do not represent Mr. Havilson at trial, but I don't see anything in the record that supports the notion that he had a collection of images that he distributed and traded in return for other child pornography images. That's just simply not supported in the record. The so-called collection of images that he's talking about are those 1,400, give or take, images that were reconstructed by the government using forensic software from unallocated file space. They were deleted files. And to call that a collection and to suggest that he was distributing images that he could not even access because they are in unallocated space, I find to be, frankly, outrageous. But that's my reading of the record. Now, the question comes up on the restitution of whether he could. Now, those images that he's supposed to have possessed of those six victims were those images that were in unallocated space. So there is even a question about whether or not he could possess those images because he could not access them. He had no control over them. And in order to possess them, you have to have both. Now, they conceded. Mr. Corley did not write the brief. I read the brief at page 36 that they conceded that applying gross was an incorrect application of that guideline. Now, they want to maintain that. You only have six seconds. I think you better wrap it up and not start a long thought here. I think we have your argument. I'm just reading the record entirely different. All right. But the court can read the record inside. Thank you. Thank you both. The court is the ultimate arbiter. All right. Thank you. Thank you both. We'll call the next case.